UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WORCESTER DIVISION

| | |
|---|---|
| SANDRA S. KATZ,<br>        Plaintiff<br><br>v.<br><br>DONNA LEE H. WILLIAMS, INSURANCE<br>COMMISSIONER OF THE STATE OF<br>DELAWARE AS RECEIVER OF NATIONAL<br>HERITAGE LIFE INSURANCE COMPANY<br>IN LIQUIDATION,<br>        Defendant and<br>        Third Party Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION;<br>UNITED STATES OF AMERICA;<br>E. PERRY KING;<br>ALAN MASON;<br>ALAN MASON LEGAL SERVICES, P.C.;<br>ALAN MASON LEGAL SERVICES, INC.,<br>ALAN MASON d/b/a<br>ALAN MASON LEGAL SERVICES, P.C.;<br>ALAN MASON d/b/a<br>ALAN MASON LEGAL SERVICES, INC.;<br>and<br>ALAN MASON LEGAL SERVICES, P.C. d/b/a<br>ALAN MASON LEGAL SERVICES, INC.,<br><br>        Third Party Defendants. | CIVIL ACTION<br>NO. 05-40014-FDS |

## UNITED STATES' MOTION TO DISMISS AS TO
## THIRD PARTY COMPLAINT

On December 27, 2004, Defendant Donna Lee H. Williams, Insurance Commissioner of the State of Delaware (hereafter, "Williams"), filed a third party Complaint against the United States and its agency, the Federal Deposit Insurance Corporation ("FDIC") in Worcester Superior Court.   Williams is the receiver of National Heritage Life Insurance Company, a company in liquidation (hereafter, "NHL"). Williams Complaint ¶ 1.   The Williams Complaint, together with the first party Complaint, was removed to United States District Court on or about January 21, 2005. This Court kindly granted the United States leave to file its Answer, on behalf of itself and its agency, on or before April 4, 2005.   The United States requests that this Court dismiss Counts II, III, IV,VII, VIII and X of the Williams Complaint pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure.

## I. THE FACTS APPLICABLE TO THE UNITED STATES

Sandra Katz filed an action against Williams, October 26, 2004, seeking a declaratory judgment regarding whether NHC has the legal right to enforce a $112,000 mortgage note[1] signed by E. Perry King and Terry A. King (hereafter, "the Kings") secured by a mortgage on property that Katz then owned at 19 Canton Street, Worcester,

·

---

[1]  The note is Exhibit B to Williams' Complaint.

Massachusetts.[2]  Williams then filed a third party Complaint against the United States and its agency, the FDIC, as well as against attorney Alan Mason, who represented the Kings.  NHL is the owner of the Kings' mortgage note.  The note arose out of a mortgage loan given to the Kings on January 27, 1988, by the Home National Bank of Milford, on 19 Canton Street.  Williams Complaint ¶¶ 12-13 and Exhibit A to the Complaint.  The Kings transferred 19 Canton Street to Mansour Gaval and Nader Gaval on December 19, 2003.  Id. at ¶ 17.  Sandra Katz purchased 19 Canton Street on December 19, 2003.  Williams Complaint ¶¶ 17, 25.  On July 8, 2004, Katz received a notice of default of the note and intent to foreclose from NHL.  Id. ¶ 26.

When Katz purchased the property, in 2003, a Satisfaction of Mortgage had been filed at the Worcester County Registry of Deeds, executed by the FDIC as receiver for Home National Bank of Milford on July 19, 2002, averring that the $112,000 King mortgage note had been paid off.  Id.  ¶ 23.  Williams alleges that the United States is liable for the amount of the mortgage note because the FDIC executed the Satisfaction of Judgment when the Kings had not, in fact, paid off the mortgage.

The FDIC acquired the mortgage note from the Home National Bank of Milford when it took over the Bank's assets when the Bank failed on June 1, 1990.  Id. ¶ 14.  The FDIC sold and assigned the note to the South Star Management Company, Inc., a

---

[2]  Katz sold her property at 19 Canton Street on March 18, 2005.  See Exhibit D to this memorandum.

Florida Corporation. Id. ¶ 12 and Exhibit D; see Exhibit A to this memorandum ("Loan

Sale Agreement" between FDIC and South Star Management Co., December 17, 1993, at

pgh. 12).[3] The Loan Sale Agreement provided that South Star Management Co. was to

record the assignment at the Registry of Deeds. Id. On information and belief, South

Shore Management Co. did not do the recording. South Shore Management sold the note

to National Housing Exchange; id. ¶ 14 and Exhibit C; and thereafter, the note became

vested in NHL. Id. at ¶ 15. NHL obtained a judgment(s) on the note in or about 1997,

while the Kings were still titleholders to 19 Canton Street. Id. ¶ 15.

    The Complaint alleges that Attorney Alan Mason contacted the FDIC on or about

July 2002, to request a discharge statement on the Kings' mortgage note, and two

affidavits were sent to FDIC in support of this request. Williams Complaint ¶ 18-19. The

first document was an affidavit from E. Perry King and Terry A. King, dated July 18,

2002, stating:

> I certify that the Note and Mortgage . . . was paid in full on . .
> August 1991. In the event that it is determined that there are
> monies due and owing under the Note, said monies will

---

[3] Consideration of documents not already in the record does not require a district court to convert a motion to dismiss into one for summary judgment, as documents needed to determine the jurisdiction of the court are not considered "outside the pleadings" under Rule 12 (b), Federal Rules of Civil Procedure. See Beddall v. State Street Bank, 137 F.3d 12, 16-17 (1st Cir. 1998) (taking a "practical commonsense approach" and considering documents without converting motion where allegations of complaint were dependent on documents and authenticity not challenged); Watterson v. Page, 98 F.2d 1,3 (1st Cir. 1993) (exceptions to general rule requiring conversion can be applied "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint").

immediately be remitted to the Federal Deposit Insurance
Corporation as Receiver of Home National Bank of Milford.
I make this Affidavit in order to induce the Federal Deposit
Insurance Corporation as Receiver of Home National Bank of
Milford to discharge Mortgage . . . . I agree to indemnify the
FDIC against any and all loss as a result of a claim for
wrongful discharge of the Mortgage . . . . I am aware that the
FDIC will rely on the Truthfulness and the statements
contained herein. I am aware that any person who makes
false representations to the Federal Deposit Insurance
Corporation is subject to criminal prosecution pursuant to 18
U.S.C. § 1007.

See Williams Complaint ¶ 19, and Exhibit B to this memorandum. The second document

was an Affidavit from Attorney Alan Mason, dated July 9, 2002, making the same

representations. See Williams Complaint ¶ 18 and Exhibit C to this memorandum.

The Complaint alleges that these affidavits were fraudulent. Williams Complaint ¶¶ 18-

19. After receiving these affidavits, the FDIC issued the Satisfaction of Mortgage.[4]

Williams seeks damages against the United States and the FDIC in tort and under

the Fifth Amendment to the United States Constitution, alleging the FDIC's misconduct

in executing the Satisfaction of Judgment on the Perry's mortgage note.

## II. **THE APPLICABLE LEGAL STANDARD UNDER RULE 12(b)**

Pursuant to Rule 12(b)(1) and (6), Federal Rules of Civil Procedure, the United

States requests that this Court dismiss the Complaint for lack of subject matter

---

[4] E. Perry King represented once again, on July 23, 2004, that the note had been
paid. Williams Complaint ¶ 27 and Exhibit H thereto.

jurisdiction.  In deciding a defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pleaded factual assertions as true and draw all reasonable inferences from these assertions in the plaintiff's favor.  See Aybar v. Crispin-Reyes, 118 F.3d 10, 13 (1st Cir. 1997).  In order to survive a motion to dismiss, a plaintiff must assert all "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery."  Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988).  Although all inferences must be made in the plaintiffs' favor, the court need not accept "bald assertions, unsupportable conclusions, . . . and the like."  Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996), and "will not accept a complainant's unsupported conclusions or interpretations of law."  Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir. 1993).

## III. THIS COURT LACKS JURISDICTION TO DECIDE WILLIAMS' CLAIMS BECAUSE THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY.

The United States is immune from suit unless it has expressly consented to be sued. United States v. Mitchell, 445 U.S. 535 (1980).  The burden is on the plaintiff to establish a waiver of sovereign immunity before a suit against the United States is permitted. Block v. North Dakota, 461 U.S. 273, 287 (1983).  See United States v. Testan, 424 U.S. 392, 399 (1976)  (The federal government and its agencies are "absolutely shielded from tort actions for damages unless sovereign immunity has been waived.").  Sovereign immunity is a jurisdictional bar to suits against the federal government and its

6

agencies.  FDIC v. Meyer, 510 U.S. 471, 475 (1994).[5]

## A.  THE UNITED STATES IS IMMUNE FROM SUIT FOR THE TORTS ALLEGED.

The Federal Tort Claims Act (hereafter FTCA) grants a limited waiver of

sovereign immunity with respect to certain categories of torts committed by federal

employees, together with grant of jurisdiction to the federal district courts.  See 28 U.S.C.

§ 1346(b)(1).  Bolduc v. United States, ___ F.3d ___, 2005 WL 665278 * 4 (1st Cir.

2005), citing FDIC v. Meyer, 510 U.S. at 475-77.   That grant extends to claims for

monetary damages,

> For injury or loss of property, or personal injury or death
> caused by the negligent or wrongful act or omission of any
> employee of the Government while acting within the scope of
> his office or employment, under circumstances where the
> United States, if a private person, would be liable to the
> claimant in accordance with the law of the place where the act or omission
> occurred.

28 U.S.C. § 1346(b)(1).  However, this waiver of sovereign immunity is circumscribed by

a number of exceptions.  See 28 U.S.C. § 2680(a)-(n).   Bolduc v. United States, at * 5.

The waiver of sovereign immunity is limited by subsection (h) of 28 U.S.C. §

2680, which creates exceptions for certain tort claims, those:

---

[5] Where a plaintiff has not pleaded and proved compliance with this jurisdictional prerequisite, she cannot survive a motion to dismiss.  Eveland v. Director, CIA, 843 F. 2d 47 (1st Cir. 1988); In Re "Agent Orange" Product Liability Litigation, 818 F.2d 210, 214 (2d Cir. 1987) ("burden is on the plaintiff to both plead and prove compliance with the statutory requirements").

> arising out of assault, battery, false imprisonment, false arrest,
> malicious prosecution, abuse of process, libel, slander,
> misrepresentation, deceit, or interference with contract rights.
> . . .

These statutory exceptions include not only the tort claims that are identified, but also tort claims that are essentially the same or arise out of these claims. See Sheridan v. United States, 487 U.S. 392 (1988) (Plaintiff cannot frame an assault and battery claim as a negligence claim, alleging failure to prevent assault and battery or any other claim "arising out of" assault and battery, as there must be an "independent duty" for claim to be sustained). Shearer v. United States, 473 U.S. 52, 55 (1985).   The exceptions define the limits of federal subject matter jurisdiction. Hydrogen Technology Corp. v. United States, 831 F.3d 1155, 1161 (1st Cir. 1987).  If a plaintiff's claim falls "within the compass of these exceptions," it is "outside the ambit of federal subject matter jurisdiction." Muniz-Rivera v. United States, 32 F.3d 8, 12 (1st Cir. 2003).  As to all waivers of sovereign immunity, the tort waiver must be "construed strictly in favor of the federal government, and must not be enlarged beyond such boundaries as its language plainly requires." Id., citing United States v. Horn, 29 F.3d 754, 762 (1st Cir. 1994).

### (1) Williams' Claims For Misrepresentation And Deceit Are Barred By the FTCA

In Count II, Williams alleges in terms that the United States is liable for damages due to the FDIC's "misrepresentations and deceit" in executing the July 19, 2002, Satisfaction of Mortgage.  Williams Complaint ¶ 37.  As noted, any claim for

"misrepresentation, deceit. . . ." is barred by the statutory exceptions.  28 U.S.C. § 2680(h).

The misrepresentation exception precludes liability of the United States whether there has been either an affirmative misrepresentation or failure to disclose, and irrespective of whether the misrepresentation was willful or merely negligent.  United States v. Neustadt, 366 U.S. 696, 702 (1961) (allegations that the United States negligently inspected and appraised a home financed by the Federal Housing Administration was essentially a negligent misrepresentation claim and barred by subsection 2680(h).  See Muniz-Rivera, 326 F.3d at 12-13.  Because Count II of Williams' Complaint is seeks compensation from the United States for a tort that is expressly barred by the FTCA, this Court lacks jurisdiction to decide the claim.

## (2)  Williams' Claim For Violations of Chapter 93A Is Barred By the FTCA

Count III of Williams' Complaint claims that the United States is liable pursuant to the Massachusetts Consumer Protection Act, M.G.L. Ch. 93A.  She alleges that the United States committed "unfair and deceptive practices . . . in a willful and wanton manner."  M.G. L. Ch.93A, § 2 prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Williams' claim must fail as a matter of law for at least three reasons: First, the Consumer Protection Act confers liability for "unfair and deceptive trade practices," which is merely another way of characterizing the misrepresentation and deceit claims that are explicitly barred by the

9

FTCA. 28 U.S.C. 2680(h). It is well settled that claims "arising under" misrepresentation or deceit are barred as effectively as those that are plainly stated as such. See United States v. Neustadt, 366 U.S. at 702; see Santoni v. FDIC, 677 F.2d 174, 179 (1st Cir. 1982) (claims characterized as breach of contract and promissory estoppel are in fact tort claims subject to the misrepresentation exception); Jiminez-Nieves v. United States, 682 F.2d 1, 4 (1st Cir. 1982) (action based on communication of information upon which a party relies is barred by sovereign immunity). See also, Washington v. Dept. of HUD, 953 F. Supp. 762, 778 (N.D. Tex. 1996) (claims under state unfair and deceptive trade practices statutes should be dismissed because they fall within the misrepresentation exception).

Second, the Consumer Protection Act applies to "trade or commerce," whereas the FDIC was not engaged in trade or commerce. Parties motivated by legislative mandate, and not business reasons, cannot fall within the proscriptions of the Act. See Poznik v. Massachusetts Prof'l Insurance Ass'n., 417 Mass. 48, 52 (1994) (entity established by the legislative to provide medical malpractice insurance not in "trade or commerce" under chapter 93A since it can have no profit, assumes no risk of loss, and has no discretion in carrying out its mandate); Lafayette Place Associates v. BRA, 427 Mass. 509, 535 (1998) (Act inapplicable to parties motivated by legislative mandate, not business or personal reasons); Town of Billerica, 2004 WL 2697615 (Mass. Land Ct.) (actions by town taxing authority not covered by ch. 93A, since collection of taxes is legislatively mandated). As

10

noted, the FDIC issued its Satisfaction of Judgment in connection with its legislatively-mandated duties as receiver of failed banks. It had no economic interest at stake in issuing the Satisfaction of Judgment, since it did not own or control the loan and did not sell the note to NHL. Compare, United States v. United States Trust Co., 660 F. Supp. 1085, 1090 (D. Mass. 1986) (United States could have been a plaintiff under the statute where its own economic interest was a stake in that the Small Business Administration claimed that defendant bank had mishandled its money). Indeed, section 3 of the Massachusetts Consumer Protection Act provides explicitly that "Nothing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States." 12 U.S.C. § 1821(c)(3) (provision granting authority to FDIC to act as receiver for failed banks).

### (3) Williams' Claim For Interference With Business Relations Is Barred By the FTCA

Count VII of Williams' Complaint claims that the United States is liable for interference with the business relationships of NHL. Subsection (h) of 28 U.S.C.A. § 2680 excepts from the waiver of sovereign immunity "any claim arising out of . . . interference with contract rights. . . ." Interference with business relationship is simply an extension of the tort of interference with contract rights and is barred by subsection (h). Art Metal-U.S.A. v. United States, 754 F.2d 1151, 1155-56 (D.C.Cir. 1985) ("As nearly every court . . [has held]", claims for tortious interference with business advantage

11

are barred as claims arising out of interference with contract rights (citations omitted); Chen v. United States, 843 F.2d 622, 627 n.-2 (2d Cir. 1988); Contemporary Mission, Inc. v. USPS, 648 F.2d 97, 104-05 n. 9 (2d Cir. 1981) (to extent that plaintiff alleges that USPS investigation constitutes tortious interference with business relations, it is barred by subsection (h). Dupree v. United States, 264 F.2d 140, 143 (3rd Cir. 1959).

Moreover, an essential element of the tort of interference with business relations under Massachusetts common law is intent to interfere with improper motive or means. Dulgarian v. Stone, 420 Mass. 843, 851 (1995) see Pembroke Country Club v. Regency Savings Bank, F.S.B., 62 Mass. App. Ct. 34, 36 (2004) (elements of tortious interference with business relationship are that business relationship existed, defendant knew of it, defendant intentionally interfered with it for an improper purpose or by improper means; and plaintiff was damaged by the interference). Plaintiff Williams does not allege any facts regarding improper motive or method, and there is no evidence alleged in theWilliams Complaint to support it. The FDIC issued the Satisfaction of Judgment in reliance on the affidavits of the mortgagors, the Perrys, and their attorney, Alan Mason, and in connection with its experience that consumers often have difficulty obtaining mortgage loan discharge statements when assets of failed banks have been sold and resold over time. Accordingly, the FTCA bars liability of the United States for interference with a business relationship.

12

### (4) <u>Williams Claim For Slander Is Barred By the FTCA</u>

Count VIII of Williams' Complaint alleges that the United States engaged in "slander of title" against NHL. "Slander" is an explicit exception to the waiver of sovereign immunity under the FTCA. 28 U.S.C. § 2680(h). <u>Art-Metal U.S.A., Inc. v. United States</u>, 753 F. 2d at 1155-56 (slander, as well as related torts of injurious falsehood, and defamation barred by FTCA)(citations omitted). Accordingly, this Count must be dismissed for lack of jurisdiction.

### (5) <u>Williams' Claim for Simple Negligence is Barred by the FTCA</u>

Count IV of the Complaint alleges that the government is liable to Williams for negligently issuing the Satisfaction of Mortgage. Plaintiff may not frame her claim in simple negligence and avoid the jurisdictional bar imposed by subsection 2680(h) if the negligence claim "arises out" of negligence, slander, or interference with contract claims, that is, if the gist of the negligence claim is the same as an excepted tort and arises out of the same duty. <u>United States v. Neustadt</u>, 366 U.S. at 704 (negligence claim was barred because it arose out of the government's duty to use due care in communicating information, which is the basis for misrepresentation). In <u>Block v. Neal</u>, 460 U.S. 289, 297 (1983), the Court found that Plaintiff's tort claim in negligence was allowed because it differed from the excepted tort of misrepresentation in that the duty underlying the claim -- the duty of constructing and inspecting a building with due care -- was distinctly different from the duties forming the basis of a claim of misrepresentation. However, the

13

duty of due care underlying Williams' claim of negligence is the same as the tort of misrepresentation, that is, a duty to communicate truthful information.  See Santoni v. United States, 677 F.2d 174, 176 (1st Cir. 1982), where the plaintiff, who had submitted an unsuccessful bid to the FDIC, alleged an implied contract through promissory estoppel.  The Court looked behind the characterization of the claim and held that the essence of the complaint was the FDIC's failure to communicate properly, barring the claim due to the "misrepresentation" exception.  Similarly, in Muniz-Rivera v. United States, 326 F.3d at 12-13, the plaintiff alleged negligent failure of government agencies to warn of flooding and the need for flood insurance in issuing a loan to purchase property.  The Court held that this claim, while phrased as negligence, was based on the same duty as the excepted tort of misrepresentation and not actionable. See also Atorie Air, Inc. v. FAA, 942 F.2d 954, 957 (5th Cir. 1991) (plaintiff's allegations that the government negligently misdiagnosed condition of plaintiff's airplane had same essential conduct as can fairly be read to arise out of conduct that would establish a misrepresentation action); Hamri v. United States, 799 F.2d 455, 456 (8th Cir. 1986) (allegations of improper inspection was not simple negligence but were barred as misrepresentations of the appraiser).  Williams' allegation regarding negligence for issuing an untrue Satisfaction of Mortgage is the same allegation as to conduct that is the basis of her other tort counts and based on the same duty of FDIC officials.  Simple negligence is not distinctly different in conduct or in duty from misrepresentation and is, accordingly, barred under

14

subsection 2680(h).

### (B)  THIS COURT LACKS JURISDICTION OVER WILLIAMS' CLAIM UNDER THE FIFTH AMENDMENT

Count X of Williams' Complaint alleges that the United States is liable because it has violated the "takings" clause of the Fifth Amendment to the United States.  This Court lacks jurisdiction regarding this count for two reasons, first, the factual elements of a "taking" are not present in this case, and, second, exclusive jurisdiction for "takings" claims lies in the United States Court of Federal Claims and not the United States District Court.  The Fifth Amendment provides: "nor shall private property be taken for public use without just compensation."  A "takings" occurs when the United States actually invades or converts property for public use; Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 427 (1982); or regulates private property to the extent that substantially all of the economic use of the property as a whole has been stripped from private use.  Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 331-32 (2002).  In either case, a "taking" occurs only when the United States acquires an interest in the disputed property.  In this case, the Complaint does not allege any facts regarding acquisition of a property interest by the FDIC when the FDIC issued its Satisfaction of Mortgage.  Indeed, as is set forth by the Complaint, the FDIC had sold the public's interest in the mortgage note in or about 1993.  Once sold, the FDIC retained no rights whatever to the note or the secured property.  See Williams Complaint

15

¶¶ 14-15 and Exhibits C-E.  See also, Exhibit A to this memorandum (Loan Sale Agreement).  Accordingly, as a matter of law, the Complaint does not allege an essential element to a Fifth Amendment "taking" and this Court lacks jurisdiction to grant the relief sought in Count X.

Second, "takings" claims under the Fifth Amendment must be brought in the United States Court of Federal Claims and not this Court.  The United States has waived immunity from suit regarding compensation for loss of property interests through the Tucker Act, which waives immunity on the condition that actions be brought in the Court of Federal Claims  As noted above, "[t]he United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The Tucker Act waives sovereign immunity in all actions brought in the Court of Federal Claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000).  Jurisdiction over such claims lies in the Court of Federal Claims unless another court is expressly provided with jurisdiction by statute.  Id.  See Bowen v. Massachusetts, 487 U.S. 879, 910 n. 48 (1988).  (Court of Federal Claims "jurisdiction 'exclusive' only to the extent that Congress has not granted any other court

authority to hear the claims that may be decided by the [Court of Federal Claims]").[6]

Accordingly, because sovereign immunity has not been waived for the claims set forth in

Williams' Complaint, Count X should be dismissed for lack of jurisdiction by this Court.

## IV. CONCLUSION

For the foregoing reasons, the United States requests that this Court dismiss

Counts II, III, IV, VII, VIII, and X as against the United States and the FDIC.

Respectfully submitted,

MICHAEL J. SULLIVAN,
United States Attorney

BY:    _Anita Johnson_
Anita Johnson
Assistant U. S. Attorney
U.S. Courthouse - Suite 9200
1 Courthouse Way
Boston, MA   02210
(617) 748-3282

Of Counsel:
Paul D. Maggioni, Jr.
FDIC, Legal Services Office
New York Legal Services Office
20 Exchange Place
New York, NY 10005
917-320-2864

---

[6] Under 28 U.S.C. § 1346(a)(2), the so-called Little Tucker Act, the district courts have concurrent jurisdiction with the Court of Federal Claims over Tucker Act actions in which the amount sought to be recovered does not exceed $10,000. In this case, the compensation requested is at least $112,000 and, therefore, Little Tucker Act jurisdiction is inapplicable.

17

## CERTIFICATE OF SERVICE

I certify that the foregoing has been served upon counsel of record, James F. Creed, Jr., 1329 Highland Avenue, Needham, Mass. 02492, counsel for Plaintiff Williams and Robert B. Gibbons, 100 Front St., Worcester, Mass. 01908, by first class mail, postage prepaid, on this fourth day of April, 2005.

EXHIBIT A

FEDERAL DEPOSIT INSURANCE CORPORATION
BULK SALE NUMBER: FCO-93-6BM16

# SCHEDULE OF ASSETS

| PKG # | LAMIS NUMBER | BORROWER | BOOK VALUE AS OF 12/23/93 | SALE PRICE AS % | SALE PRICE |
|---|---|---|---|---|---|
| | 506 FRANKLIN CONSOLIDATED OFFICE | | | | |
| | 6.00% : CURRENT PRIME RATE | | | | |

## 6BM16

| PKG # | LAMIS NUMBER | BORROWER | BOOK VALUE | SALE PRICE AS % | SALE PRICE |
|---|---|---|---|---|---|
| 6BM16 | 4202000165033 | SPENLINHAUER ROBERT J | 429,880.69 | 60.00% | 257,928.41 |
| 6BM16 | 4202000165643 | WATKINS NORRIS | 114,070.40 | 60.00% | 68,442.24 |
| 6BM16 | 4202003964561 | BRETON JOHN | 58,837.02 | 60.00% | 35,302.21 |
| 6BM16 | 4211001698961 | ARBETTER,STEPHEN | 142,710.96 | 60.00% | 85,626.58 |
| 6BM16 | 4211001713311 | KING, TERRY* | 111,776.15 | 60.00% | 67,065.69 |
| 6BM16 | 4211001713421 | KING, TERRY* | 108,623.91 | 60.00% | 65,174.35 |
| 6BM16 | 4211001724371 | ADAMS DAVID | 50,000.00 | 60.00% | 30,000.00 |
| 6BM16 | 4245001892031 | HUMPHREY'S LIMITED* | 60,152.00 | 60.00% | 36,091.20 |
| 6BM16 | 4245001892061 | HUMPHREY'S LIMITED* | 6,094.79 | 60.00% | 3,656.87 |
| 6BM16 | 4245004033211 | OMALLEY MARY* | 33,407.15 | 60.00% | 20,044.29 |
| 6BM16 | 4286002177131 | MCCANN JOHN C | 65,540.83 | 60.00% | 39,324.50 |
| 6BM16 | 4308002261361 | PALUMBO ANTHONY | 110,547.73 | 60.00% | 66,328.64 |
| 6BM16 | 4308002264801 | GRUBBS, SANDRA K | 152,696.53 | 60.00% | 91,617.92 |
| 6BM16 | 4308002267611 | VIGLIOTTI DAVID JR | 147,519.34 | 60.00% | 88,511.60 |
| 6BM16 | 4312000188603 | KELLY, GREGORY | 118,117.28 | 60.00% | 70,870.37 |
| 6BM16 | 4362003924781 | DRISCOLL, MICHAEL | 154,572.17 | 60.00% | 92,743.30 |
| 6BM16 | 4362500001713 | HIPP, CHARLES M | 183,698.05 | 60.00% | 110,218.83 |
| 6BM16 | 4362500012421 | MULLINGS, LUKE L | 207,627.13 | 60.00% | 124,576.28 |
| 6BM16 | 4371004029991 | MORAN*** PHILIP D | 290,712.38 | 60.00% | 174,427.43 |
| 6BM16 | 4393004008321 | O'DONNELL, JOHN D | 180,470.48 | 60.00% | 108,282.29 |
| 6BM16 | 4393500237251 | SULLIVAN BRIAN | 47,697.08 | 60.00% | 28,618.25 |
| 6BM16 | 4417000181683 | PASQUARIELLO DAVIS J* | 33,066.24 | 60.00% | 19,839.74 |
| 6BM16 | 4417000181693 | PASQUARIELLO DAVIS J* | 44,388.63 | 60.00% | 26,633.18 |
| 6BM16 | 4417000181703 | PASQUARIELLO DAVIS J* | 44,653.24 | 60.00% | 26,791.94 |
| 6BM16 | 4417000181713 | PASQUARIELLO DAVIS J* | 44,653.24 | 60.00% | 26,791.94 |
| 6BM16 | 4430000181213 | MELONE LORETTO F | 101,169.93 | 60.00% | 60,701.96 |
| 6BM16 | 4430000201303 | CIAMPA JR, JOSEPH J | 88,470.48 | 60.00% | 53,082.29 |
| 6BM16 | 4430004023411 | THOMAS, CAROL J | 83,334.75 | 60.00% | 50,000.85 |
| 6BM16 | 4450500025063 | KEOMOUANGCHANH PHO | 138,287.03 | 60.00% | 82,972.22 |
| 6BM16 | 4450500040693 | ALEX, SAMUEL | 93,464.24 | 60.00% | 56,078.54 |
| 6BM16 | 4450500041133 | ERAMO***, PETER | 50,284.86 | 60.00% | 30,170.92 |
| 6BM16 | 4461000211963 | BROWN, JOSIE L | 116,025.90 | 60.00% | 69,615.54 |
| 6BM16 | 4461500034563 | GAMES, PAUL M | 120,357.97 | 60.00% | 72,214.78 |
| 6BM16 | 4461500034963 | JOSHI, PRABHAKAR G | 35,994.35 | 60.00% | 21,596.61 |

---

| TOTALS | 34 | 3,768,902.93 | | 2,261,341.76 |
|---|---|---|---|---|

## LOAN SALE AGREEMENT

### LOAN SALE NO. FCO-93-6BM16

### PACKAGE 6BM16

THIS AGREEMENT, entered into this 17th day of December, 1993, by and between the Federal Deposit Insurance Corporation ("FDIC" or "Seller") in its corporate [receivership] capacity and South Star Management Company, Inc. a Florida corporation ("Buyer") sets forth the terms and conditions whereby Seller agrees to sell and Buyer agrees to purchase all those Loans set forth in the attached Schedule of Loans for the consideration herein stated.

NOW THEREFORE, the Seller and the Buyer agree and represent as follows:

1. **Definitions**: The following terms shall be defined as follows:

   1.1    **"Agreement"** means this Loan Sale Agreement and the Attachments thereto.

   1.2    **"Asset File"** means all documents compiled by the FDIC in connection with the management of a loan since its acquisition from the Former Bank, with the exception of FDIC internal memoranda, and confidential communications between FDIC and its legal counsel.

   1.3    **"Bidding Instructions"** means the Invitation to Bid and Instructions and Conditions of Bid including the Bid Form, Affidavit of Disclosure, Confidentiality Agreement, Bidder's Checklist, Affidavit of Non-Collusion, the Agreement, and the Asset Spreadsheet.

   1.4    **"Bill of Sale"** means the document executed by an authorized representative of Seller, by which Seller sells, assigns and conveys to Buyer all rights, title, and interests of Seller in the Loans which are the subject of this Agreement, in the form of Attachment 2.

   1.5    **"Book Value"** for all loans, except those with pre-computed interest, means the unpaid Principal Balance (including such additional charges, if any, as those for credit life insurance, accident and health insurance and vendor's single interest insurance) of each Loan stated on the books and records of the FDIC as of any specific date. Book Value for pre-computed interest loans means the unpaid Principal Balance (including such additional charges, if any, as those for credit life insurance, accident and health insurance and vendor's single interest insurance) plus the earned and unearned interest as stated on the books and records of the FDIC as of any specific date.

   1.6    **"Business Day"** means any day other than a Saturday, Sunday, or a National Holiday.

   1.7    **"Calculation Date"** means the date established by the FDIC prior to the bid opening date, which date shall be used to calculate the Loan Purchase Price. The Calculation Date for this sale is October 20, 1993.

   1.8    **"Closing"** means the simultaneous delivery by Seller and Buyer of documents and funds, and the performance of the acts herein provided to be performed at the Closing.

1.9 **"Closing Date"** means a time and date selected by the FDIC for the Closing on or before twenty (20) Business Days after the FDIC notifies Buyer orally that its bid has been accepted, unless the FDIC, in its discretion, deems it necessary to extend such time.

1.10 **"Credit File"** means all documents, excluding the Note, renewals of the Note, and Collateral Documents, in the possession of Seller pertaining to any Loan subject to this Agreement which the Seller has obtained from the Former Bank and maintained as its primary source of information on such Loans.

1.11 **"Collateral Document"** means each deed of trust, mortgage, assignment of production, security agreement, assignment of security interest, personal guaranty, corporate guaranty, letter of credit, pledge, collateral agreement, loan agreement, or other agreement or document, whether an original or copy or whether similar to those enumerated, securing the performance or payment of any note evidencing a Loan subject to this Agreement, and inuring to the benefit of the holder of the Note.

1.12 **"Debtor"** means any obligor or guarantor or surety of any Loan in any Loan Package, or any other party liable for the performance of obligations associated with any Loan in any Loan Package.

1.13 **"Former Bank"** means any failed depository institution the assets of which were formerly insured by the FDIC or, prior to August 9, 1989, by the Federal Savings and Loan Insurance Corporation and whose assets were acquired by the FDIC for liquidation.

1.14 **"Loans"** means and includes: (a) the obligation evidenced by each promissory note included in the Loan Package; (b) any promissory note renewed by a Note, and any promissory note renewing any Note; (c) all rights, powers, liens, or security interests of the Seller in or under any collateral document; and (d) any judgment founded upon a Note, to the extent attributable thereto, and any lien arising therefrom.

1.15 **"Loan Package"** means one of the group of Loans identified in the Schedule of Loans.

1.16 **"Loan Purchase Price"** means the aggregate Book Value as of the Calculation Date of all Loans in the Loan Package(s) purchased by Buyer, multiplied by the percentage(s) bid by the Buyer for each Loan Package, as shown on the Bid Form.

1.17 **"Note"** means each promissory note or other evidence of indebtedness included in each Loan.

1.18 **"Participated Loan"** means each Loan subject to a shared credit, participation or similar inter-creditor agreement under which the Former Bank was lead or agent financial depository institution or otherwise managed the credit or sold participations, or under which the Former Bank was a participating financial depository institution or purchased participations in a credit managed by another.

1.19 **"Repurchase Price"** means the price paid by the Seller for Loans repurchased from the Buyer pursuant to the terms of this Loan Sale Agreement. The Repurchase

Price is calculated by one of the following two calculation methods designated by the Seller. Method A applies to all Loan Packages containing similar quality Loans and may apply to Loan Packages containing mixed quality Loans. Method B applies only to such Loan Packages containing mixed quality Loans as the Seller shall deem, in its sole discretion, to require tiered Repurchase Prices. Attachment 5 will specify which Loan Package(s), if any, is(are) subject to a Method B calculation.

**Method A**: "Repurchase Price" means (i) the Book Value of a Loan as of the Calculation Date, (ii) plus or minus any adjustments made prior to the Settlement Date, as appropriate, (iii) multiplied by the Buyer's percentage bid, (iv) minus any collections received with respect to the Loan since the Calculation Date regardless of how applied to the Loan, and (v) plus an amount equal to sums reasonably expended by the Buyer that are directly related to documenting the unenforceability of a loan obligation, such as credit reports or court record.

**Method B**: "Repurchase Price" means (i) the Book Value of the Loan as shown on the Schedule of Loans, (ii) plus or minus any adjustments made prior to the Settlement Date, as appropriate, (iii) multiplied by the Repurchase Percent as calculated by the Seller in Attachment 5, (iv) minus any collections received with respect to the Loan since the Calculation Date regardless of how applied to the Loan, and (v) plus an amount equal to sums reasonably expended by the Buyer that are directly related to documenting the unenforceability of a loan obligation, such as credit reports or court record.

1.20    **"Schedule of Loans"** means the document containing a full and complete list of all Loans which are the subject of this transaction (Attachment 1).

1.21    **"Settlement Date"** means the date within ninety (90) calendar days after the Closing Date upon which final adjustments will be made to the Loan Purchase Price.

2.    **Incorporation by Reference**:  The Bidding Instructions shall be considered part of this Agreement as if fully set forth herein.

3.    **Terms and Conditions of Sale**:  Seller agrees to sell, assign, transfer, and convey to Buyer, on the terms and conditions set forth in this Agreement, all the right, title, and interest of Seller, as of the Closing Date, in and to each Loan in the Loan Package(s).

4.    **Loan Purchase Price**:  Buyer shall pay to Seller, at the Closing, by cashier's check or wire transfer, the amount of the Loan Purchase Price less the earnest money previously paid by Buyer. All payments received by Seller before the Calculation Date shall belong to Seller. All payments received by Seller on or after the Calculation Date shall belong to Buyer. In the event that a draft Seller has received in payment of a Debtor's Loan is dishonored after the Calculation Date, an adjustment to the Loan Purchase Price in Seller's favor shall be made within ten (10) days of notification by the FDIC to the Buyer that the check has been dishonored.

5.    **Time and Place of Closing**:  Delivery of and payment for the Loans, Asset Files, Credit Files and Collateral Files shall be made on the Closing Date no later than 4:00pm EST. The Loans shall be delivered to the Buyer at 5 East 37th Street 10th Floor, New York, New York or such other place as may be practicable. Delivery of the files and other closing documents required to be delivered by the Seller shall be made upon receipt of the Loan

Purchase Price and the closing documents required to be delivered by the Buyer. The Closing shall, at the Seller's option, be either by telephone, confirmed by letter or wire, or conducted in person at the place designated by the Seller.

6.    **Adjustments to Loan Purchase Price**:  Upon the Settlement Date, the Loan Purchase Price will be adjusted to reflect any changes in the Book Value because of miscalculations, misapplied payments, unapplied payments or other accounting errors which have been discovered from the Closing Date through the Settlement Date.  Any money due will be calculated using the Bid Percentage.

7.    **Rebates and Refunds**:  The Buyer is not entitled to any rebates or refunds from the Seller from any pre-computed Loan regardless of when the note matures.  Further, on pre-computed interest Loans the Seller will not refund any unearned discount amounts to Buyer.

8.    **Forfeiture of Earnest Money and Other Remedies:**  If for any reason, without fault of the Seller, the Buyer fails to consummate a purchase upon the terms provided in its bid as accepted by Seller, the following shall be stipulated as Seller's liquidated damages: 1) all earnest money or other funds deposited with Seller as may be required by the terms of the Bidding Instructions; and, if applicable, 2) the amount of the bid minus the amount of any bid subsequently accepted by Seller for the same Loan Package(s); and, if applicable, 3) all Seller costs in seeking other bids when subsequently selling the Loans in the Loan Package(s), including but not limited to marketing costs, attorneys fees and associated costs.  The Buyer and Seller agree that the failure or refusal of Seller to alter or modify in any way the terms or conditions of this Agreement or any other documents contained in the Bidding Instructions shall not constitute fault on the part of the Seller.  Nothing contained herein is intended to nor shall it be construed to limit in any way the right of the Seller to seek any other right, remedy, relief or damages provided by law or equity. The Buyer shall not be liable for any of the foregoing damages if it shall be forced to withdraw its bid after award as the result of a supervisory directive given by its regulatory agency, provided that the Seller shall be satisfied that such supervisory directive is legally effective. In such event, the Seller shall refund Buyer's earnest money in _toto_.

9.    **Bill of Sale:**  At Closing Seller shall deliver to Buyer a Bill of Sale executed by an authorized representative of Seller, in the form attached hereto as Attachment 2, selling, assigning and conveying to Buyer all rights, title and interests of Seller in each of the purchased Loans, on the terms and conditions set forth in this Agreement.

10.   **Endorsement**:  Seller agrees to endorse the Notes evidencing purchased Loans on the Closing Date.  The endorsement will be in the following form:

Pay to the order of

_____

Without Recourse

FEDERAL DEPOSIT INSURANCE CORPORATION
_____[Capacity]_____

By:  _____
Title:  _____

11.   **Delivery of Collateral Documents**:  At Closing Seller shall deliver to Buyer each known original Collateral Document in its possession associated with a Loan in the purchased Loan Package(s), together with the contents of each Credit File associated with a Loan in the Loan Package(s).

12.   **Assignment of Loans and Collateral Documents:** At the Closing Seller shall execute and deliver to Buyer such instruments as may be required by applicable law to transfer to Buyer the right, title and interest of Seller in the Loans and such of the Collateral Documents related to such Loans as the Buyer may request.  The Seller may require the Buyer to prepare and furnish such instruments in appropriate form and, in the case of Collateral Documents representing liens on real estate, in a form suitable for filing.  When requesting execution of instruments transferring the interest of Seller in the Collateral Documents, Buyer shall furnish Seller with the Loan Package numbers, the Loan number as set forth on the Schedule of Loans, a copy of the Collateral Documents to be transferred, and copies of any previous assignments of said Collateral Document.  Buyer shall be solely responsible for the contents and form of such instruments.  Buyer hereby releases Seller from any loss or damage incurred by Buyer due to the contents of such instrument.  Buyer further agrees to indemnify and hold Seller harmless for any cause of action by any person arising out of the contents and form of such instrument.  Buyer shall record said instrument at its sole expense.  If such instrument is unacceptable to the FDIC for any reason it may return the same to Buyer with a statement of the reasons for such unacceptability.

13.   **Representations and Warranties of Buyer**:     Buyer warrants and represents as follows:

   13.1   It will not violate any laws relating to unfair credit collection practices in connection with any of the Loans transferred to Buyer pursuant to this Agreement.  Buyer hereby agrees to indemnify Seller and to hold it harmless from and against any and all claims, demands, losses, damages, penalties, fines, forfeitures, judgments, legal fees and any other costs, fees, and expenses heretofore or hereafter incurred by Seller as a result of (1) a breach by Buyer of the aforesaid warranty or (2) any claim, demand, or assertion that the Seller was in any way involved in or had in any way authorized any unlawful collection practices in connection with any of the Loans transferred to Buyer pursuant to this Agreement.  Buyer agrees to notify Seller within ten (10) business days of notice or knowledge of any such claim or demand.

   13.2   Buyer warrants, represents and agrees that it will not, without the express prior written consent of FDIC, institute any legal action in the name of FDIC or continue to prosecute in the name of FDIC any pending legal action; nor shall Buyer, intentionally or unintentionally, through misrepresentation or nondisclosure, mislead or conceal the identity of the owner of the Loans purchased pursuant to this Agreement.  Buyer acknowledges that there is no adequate remedy at law for violation of this subparagraph and consents to the entry of an order by a court of competent jurisdiction enjoining any violation or threatened violation of the provisions of this subparagraph.  Buyer hereby agrees to indemnify Seller and to hold Seller harmless from and against any and all claims, demands, losses, damages, judgements, legal fees and any other costs, fees and expenses heretofore or hereafter incurred by Seller as a result of a breach by the Buyer of the aforesaid warranty.

13.3     Buyer takes the Loans subject to any contingency fee agreements with attorneys and agrees to fulfill all obligations of the Seller thereunder. Buyer hereby indemnifies and agrees to hold Seller harmless from and against any and all claims, demands, losses, damages, penalties, forfeitures, or judgments made or rendered against the Seller or any legal fees or other costs, fees or expenses incurred by the Seller arising out of or based upon such contingency fee agreements. Buyer agrees to notify Seller within ten (10) business days of notice or knowledge of any such claim or demand.

13.4     If any Loans being transferred pursuant to this Agreement are insured or guaranteed by the United States Department of Housing and Urban Development or any other department or agency of any governmental unit, federal, state or local, and such insurance or guaranty is not being specifically terminated by the Seller, Buyer represents that Buyer has been approved by such agency and is an approved lender or mortgagee, as appropriate, if such approval is required; or, if Buyer has not been so approved, Buyer recognizes that any such insurance or guarantees may be terminated. Buyer further assumes full responsibility for determining whether or not such insurance or guarantees are in full force and effect on the date of this Agreement; and, with respect to those Loans whose insurance or guaranty is in full force and effect on the date of this Agreement, Buyer assumes full responsibility for doing all things necessary to continue such insurance or guarantees in full force and effect. Buyer agrees to assume all of Seller's obligations under the contract(s) of insurance or guaranty, agrees to indemnify and hold Seller harmless from and against any claims of breach thereof after the Closing and agrees to cooperate with Seller where necessary to complete forms required by the insuring or guaranteeing department or agency to effect or complete the transfer to Buyer.

13.5     Buyer agrees and represents that its bid and decision to purchase the Loans subject to this Agreement is based upon Buyer's own independent evaluation of the Loan Package(s) and its independent evaluation of the files made available to it prior to the time Buyer bid on the Loan Package(s). Buyer has made such independent investigation as Buyer deems to be warranted into the nature, validity, enforceability, collectibility, and value of the Loans in the Loan Package(s), and all other facts it deems material to their purchase, and is entering into this transaction herein provided for, solely on the basis of that investigation and Buyer's own judgment, and is not acting in reliance on any representation of, or information furnished by Seller and acknowledges that no employee or representative of the Seller has been authorized to make any statements or representations other than those specifically contained in this Agreement. Buyer acknowledges that (i) the FDIC has notified them that the collateral securing the loans subject to this agreement may be environmentally contaminated and (ii) Buyer has had an opportunity to review the due diligence materials made available by the FDIC regarding the loans and the collateral. Buyer hereby waives any right or cause of action it might now or in the future have against the Former Bank(s) or Seller as a result of its purchase of the Loan Package(s) subject to this Agreement; provided, however, that this waiver does not include any action taken as a result of Seller's failure to perform under the terms of this Agreement.

13.6     If a broker was involved in this transaction, Buyer represents and acknowledges that such broker was and is the representative of Buyer, not of Seller; that the broker had no authority to make any statements on behalf of Seller; that Buyer had the opportunity to review all loan documentation independently of the broker; that Buyer has no recourse against Seller for any misstatements that may have been

made by the broker; and that Buyer is solely responsible for any fees due to the broker arising out of this transaction.

13.7    Buyer, and the undersigned duly authorized representative of Buyer, acting individually, represent that Buyer is authorized to enter into this Agreement, and that all laws, rules, regulations, charter provisions and bylaws to which Buyer may be subject have been duly complied with, and that such representative is authorized to act upon behalf of and bind Buyer to the terms of this Agreement. Buyer, if a corporation, will at the Closing, supply Seller with a certified copy of a resolution of its Board of Directors authorizing Buyer's entry into this Agreement through such representative, or such other proof of authority as may be acceptable to the Seller, together with such other documents as Seller may reasonably require as evidence of Buyer's good standing, or, if Buyer is other than a corporation, such other evidence of Buyer's existence and authority as Seller may reasonably require.

13.8    Buyer represents and warrants that all information provided to Seller or its agents by or on behalf of Buyer in connection with this Agreement and the transactions contemplated hereby, including, but not limited to, the Purchaser Eligibility Certification, is true and correct in all material respects and does not fail to state any fact required to make the information contained therein not misleading.

13.9    Buyer acknowledges that (i) the FDIC has notified them that the collateral securing the loans subject to this agreement may be environmentally contaminated and (ii) Buyer has had an opportunity to review the due diligence materials made available by the FDIC regarding the loans and the collateral.

14.    **Seller's Warranties, Representations and Recourse**: This sale is made without recourse or representation or warranty, express or implied, except as provided in this Agreement. Seller has attempted to provide accurate information to all prospective Bidders. However, Seller does not represent, warrant or insure the accuracy or completeness of any information or its sources of information contained in the Bid Instructions or in any of the Credit Files, Collateral Documents, Loans, Notes or Loan Packages (whether contained in originals, duplicate originals, copies, or magnetic media, including computer tapes and disks). Further, any other provisions of this Agreement to the contrary notwithstanding, Seller and Buyer agree that no guarantee of any kind or type whatsoever, whether made by public, private, or governmental entity, which is purchased, acquired, assumed, or in any other manner transferred or conveyed to Buyer pursuant to this Agreement, whether as a Collateral Document or otherwise, is represented or warranted by Seller to be enforceable, valid, transferable, current or legal with respect to any Loan. Further, Seller has not, does not and will not make any representations or warranties with regard to compliance with any environmental protection, pollution or land use laws, rules, regulations, orders or requirements including but not limited to those pertaining to the use, handling, generating, treating, storing or disposing of any hazardous waste, hazardous substances, petroleum product storage tanks or asbestos.

15.    **Repurchases at Buyer's Option**: The Buyer may, at any time within 120 days of the Closing Date, require the

Seller to repurchase a Loan in the event that, prior to the Closing Date:

1.  The debtor had been discharged in a no asset bankruptcy proceeding and no collateral exists out of which the debt may be satisfied, and all guarantors or sureties of the Note, if any, or the obligations contained therein, have similarly been discharged in no asset bankruptcies;

2.  A court of competent jurisdiction had entered a final judgment holding that neither the debtor nor any guarantors or sureties owes an enforceable obligation to pay the holder of the Note or its assignee(s); or

3.  The Former Bank, or the Seller, had executed and delivered to the debtor a release of liability from all obligations under the Note.

Buyer shall notify Seller of each Loan with respect to which Buyer seeks repurchase, and shall supply Seller with evidence satisfactory to Seller that the same constitutes a Loan subject to repurchase. Seller shall have no obligation to repurchase any Loan for which notice and all supporting evidence have not been received by Seller within one hundred-twenty (120) days of the Closing Date. The Repurchase Price of each such Loan shall be computed in the manner set forth in Section 1.19, provided that Buyer has first re-endorsed and delivered the Note and reassigned all collateral therefor to Seller. Seller shall pay to Buyer the Repurchase Price of each Loan of which Seller has been so notified within sixty (60) days from Seller's receipt of such notice.

16.  **Collection Agency or Contingency Fee Matters**: If any of the Loans that are a part of the Loan Package(s) being sold pursuant to this Agreement are identified as being the subject of an agreement between Seller and a collection agency or are subject to a contingency fee arrangement with an attorney, Buyer agrees to purchase such Loans subject to the terms and conditions of said agreement and agrees to sign, if necessary, an identical agreement with the collection agency or attorney. In the event that Buyer assigns to a collection agency or a contingency fee attorney any Loan which is subsequently repurchased by FDIC, or which is subject to refund, Buyer agrees to be responsible for any charges incurred by the Buyer for collection agency expense and fees. In no case will Seller pay or be responsible for payment of collection agency fees or expenses.

17.  **Files and Records**: The Buyer further agrees as follows:

17.1  Buyer agrees to abide by all applicable state and federal laws, rules and regulations regarding the handling and maintenance of all documents and records relating to the Loans purchased hereunder including, but not limited to, the length of time such documents and records are to be retained.

17.2  After transfer of documents or files to Buyer pursuant to the terms of this Agreement, Buyer agrees that Seller shall have the continuing right to use, inspect, and make extracts from or copies of any such documents or records, upon Seller's reasonable notice to Buyer.

17.3  Buyer further agrees to allow the Seller the possession, custody and use of original documents for any lawful purpose and upon reasonable terms and conditions.

17.4  Before destruction or disposition of any documents or files transferred hereunder, Buyer agrees to give reasonable notice to Seller and to allow the Seller, at its own expense, to recover the same from Buyer.

18. **Reporting to or for the Internal Revenue Service**:  Buyer agrees to submit all Internal Revenue Service Forms and Information Returns for all Loans transferred to Buyer under this Agreement for the full year in which the Closing occurs and thereafter.

19. **Buyer's Duties Regarding Loans in Litigation**:  With respect to any Loan sold pursuant to this Agreement which is the subject of any type of pending litigation, Buyer shall notify the Seller's Managing Attorney, FDIC, 124 Grove Street, Franklin, MA within fifteen (15) Business Days of the Closing of the name of the attorney selected by Buyer to represent Buyer's interests in the litigation.  Buyer shall within fifteen (15) Business Days of the Closing notify the clerk of the court and all counsel of record that ownership of the Loan was transferred from Seller to Buyer.  Buyer shall have its attorney file appropriate pleadings with the court within twenty (20) Business Days of Closing substituting Buyer's attorney for Seller's attorney and also removing Seller as a party to the litigation and substituting Buyer as the real party in interest.  In the event Buyer is unsuccessful in substituting Buyer's attorney for Seller's attorney or in removing Seller as a party in interest, Buyer agrees to reimburse Seller, upon demand, for Seller's continued legal expenses in such litigation. Buyer shall reimburse Seller for all legal fees and expenses reasonably incurred subsequent to Closing.  Any Loans giving rise to a judgment obtained by an attorney on a contingent fee basis are sold subject to any such contingent fees which may be claimed by any such attorney.

Nothing contained in this paragraph shall relieve Buyer of its obligations set forth in paragraph 26 herein.

20. **Buyer's Duties Regarding Loans in Bankruptcy**:  In accordance with Bankruptcy Rule 3001(e), Buyer agrees to take all actions necessary to file, within thirty (30) Business Days of Closing, (i) proofs of claims in pending bankruptcy cases involving any Loans purchased for which Seller has not already filed a proof of claim, and (ii) evidence of the terms of the purchase of Loans hereunder with the appropriate bankruptcy court in cases in which Seller has filed proofs of claims.  Buyer shall prepare and provide to Seller within thirty (30) Business Days of Closing, an Assignment of Claim and Affidavit in the form attached hereto as Attachment 4 for all Loans purchased which are in bankruptcy at Closing.  Nothing contained in this paragraph shall relieve Buyer of its obligations set forth in paragraph 25 herein.

21. **Buyer's Duties Regarding Loans in which the Collateral is Insured**:  Buyer is responsible for having itself substituted as loss payee on all collateral risk insurance in which the Former Bank or Seller is currently listed as a loss payee.  Any loss after execution of this Agreement by Seller and Buyer to either a debtor or to Buyer or to the value or collectibility of any Loan due to Seller's cancellation of collateral risk insurance or its failure to identify Buyer as loss payee is the sole responsibility of Buyer.

22. **Buyer's Duties Regarding Loans with Escrow Accounts**:  Buyer hereby agrees to assume, undertake, and discharge any and all obligations of the holder of the Loans as may relate to the escrow, maintenance of escrow, and payments from escrow of monies paid by or on account of the Debtor.  Seller shall transfer to Buyer that sum of money held by Seller as of the Closing Date which represents collected and undisbursed escrow payments.

Seller makes no warranties or representation, of any kind or nature, as to the sufficiency of this sum to discharge any obligations related in any manner to the escrow obligation, as to the accuracy of this sum, or as to the propriety of any previous disbursements or payments from any escrow account.

23. **Buyer's Duties Regarding Loans in which Seller was the Lead Lender in a Participated Loan**: Buyer hereby agrees to assume the role of lead lender for any Loan in which a portion of the Loan was participated to one or more other entities and in which Seller was the lead lender as of the Closing Date. Buyer agrees to discharge all of Seller's obligations and duties as lead lender. Buyer hereby agrees to accept any such participated Loan subject to all participants' rights, title, and interest in such participated Loan, and Buyer hereby agrees to hold Seller harmless for any loss incurred because of Buyer's performance pursuant to this paragraph.

24. **Reimbursement for Use of Seller's Employees**: In the event of litigation with respect to the Loans purchased by Buyer in which Seller or its employees are requested or required by subpoena, court order or otherwise, to perform any acts, including but not limited to testifying in litigation, preparing responses to subpoenas or other legal process or pleadings, and/or performing any review of public or private records such as tracing funds, whether said litigation is commenced by Buyer or any other party, Seller shall be reimbursed by Buyer for the time expended by each of Seller's employees involved in the performance of said acts at the rate of $25 per hour, per employee plus all associated travel, lodging and per diem costs. Seller shall, in its sole and absolute discretion, determine and assign the personnel necessary to perform said acts. Buyer also agrees to reimburse Seller for copies made in the course of performing said acts at the rate of $.25 cents per copy. Nothing in this paragraph shall require Seller to provide Buyer with any information or service in this regard.

25. **Notice to Obligers**: Buyer or, at Seller's option, Seller, shall promptly after the Closing Date, but in no event later than thirty (30) days after the Closing Date, at its own cost and expense, give notice of this transfer to all Debtors by first class U.S. Mail at their current or last known address of record. Buyer shall be deemed to have complied with its obligation to give notice of the transfer by such mailing. A copy of any and all notices of transfer shall be delivered to the parties hereto upon completion of the notification process, but, in no event later than forty-five (45) days after the Closing Date. In the event there is no known address for a Debtor, no personal notice to that Debtor shall be necessary. Upon subsequently locating such Debtor, Buyer shall send such notice to such Debtor, with a copy to Seller. Buyer shall be liable to Seller for any and all costs and expenses incurred by Seller as a result of Buyer's failure to comply with the provisions of this paragraph. Such costs and expenses shall include, but not be limited to, salaries of Seller's personnel and other administrative expenses, the time expended by each of Seller's employees involved in the performance of said acts at the rate of $25 per hour, per employee, plus all associated travel, lodging and per diem costs. Seller shall, in its sole and absolute discretion, determine and assign the personnel necessary to perform said acts. Buyer also agrees to reimburse Seller for copies made in the course of performing said acts at the rate of $.25 cents per copy. Nothing in this paragraph shall require Seller to provide Buyer with any information or service in this regard.

26. **Notice Of Claim**: Buyer shall immediately notify Seller of any claim, threatened claim, or any litigation against Seller or the Former Bank which may come to its attention.

27. **Notices**: All notices or deliveries required or permitted hereunder shall be in writing and shall be deemed given when personally delivered to the individual hereinafter designated or when actually received by means of Fax, overnight mail or certified mail, return receipt requested, at the following address, or such other address as either party may hereafter designate by notice to the other party, making specific reference to this paragraph of this Agreement:

BUYER:      SOUTH STAR MANAGEMENT COMPANY, INC

                      5 East 37th Street

                      10th Floor

                      New York, NY  10016

Attention:     Michael Page

(800) 400-2254
Telephone Number:

SELLER:     FEDERAL DEPOSIT INSURANCE CORPORATION
                      124 Grove Street
                      Franklin, MA  02038
                      Attention:     Brian P. Miranda
                                       Asset Marketing Department
                      Telephone Number:  (508) 520-2502

Any notice sent by Fax must be confirmed by submission of an original or hard copy on the next Business Day following such notification.

28.    **Use of FDIC Name**:  Buyer agrees that it will not use or permit the use by its agents, successors or assigns, of any name or combination of letters which is similar to the FDIC or the Federal Deposit Insurance Corporation.  Buyer will not represent or imply that it is affiliated with, authorized by, or in any way related to the FDIC or a federal agency or corporation.  Buyer and Seller agree and stipulate that breach of the provisions of this section will result in actual and substantial damages to Seller, in an amount that can not be determined with precision.  It is therefore agreed that, in the event of such breach, Buyer shall pay the sum of $25,000 to the Seller for each such breach, as liquidated damages together with such fees and expenses as Seller may incur in preventing further or continuing of breach of said provision and recovering liquidated damages.  Notwithstanding the provisions of this paragraph, the FDIC may also pursue any equitable remedy it may have for Buyer's breach of this covenant.

29.    **Release of FDIC**:  Buyer agrees that it will not renew, extend, renegotiate, compromise, settle, or release any note or loan, or any right of Buyer founded upon or growing out of this Agreement, except upon payment in full thereof, unless all Debtors on said note or loan shall first release and discharge the Former Bank(s) and the FDIC in its [corporate] [receivership] capacity, and its agents and assigns (the "Released Parties") from all claims, demands and causes of action which any such Debtor may have against any such Released Party arising from or growing out of any act or omission occurring prior to the date of such release.  Such release is to be in the form of Attachment 3, hereto.  If Buyer fails to obtain such release, Buyer agrees to protect, save, and hold Seller harmless from any expense or damage the Seller suffers that could have been prevented had Buyer obtained the Release.

30.    **Severability**:  Each part of this Agreement is intended to be severable.  If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, such illegality, invalidity, or unenforceability shall not affect the legality, validity,

or enforceability of the remaining parts of this Agreement, and all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

31.    **Construction**: Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural and vice versa, and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

32.    **Assignment**: This Agreement and the terms, covenants, conditions, provision, obligation, undertaking, rights and benefits hereof, including the Attachments hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors, and assigns.

33.    **Prior Understandings**: This Agreement supersedes any and all prior discussions and agreements between the Seller and Buyer with respect to the purchase of Loans and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

34.    **Survival**: Each and every covenant made by Buyer or Seller in this Agreement shall survive the Closing and shall not merge into the closing documents, but instead shall be independently enforceable.

35.    **Choice of Law**: This Agreement shall be controlled by federal law. To the extent not controlled by federal law, this Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts. Buyer consents to jurisdiction in the federal or state courts of Massachusetts.

EXECUTED THIS 17TH DAY OF DECEMBER, 1993.

**BUYER**:

South Star Management Company, Inc.
5 East 37th Street
10th Floor
New York, NY  10016

By: _____
    Bernard A. Shafran
Title: _____
         Secretary

**SELLER**:

Federal Deposit Insurance Corporation as Liquidating Agent/Receiver of:

see attached

By: _Kirby N. Schaefer_____
    Kirby N. Schaefer
Title: Attorney-In-Fact_____

# LIST OF BANKS

Federal Deposit Insurance Corporation in its Corporate capacity as:

| Bank Number | Bank Name | Capacity |
|---|---|---|
| 4202 | MerchantsBank of Boston | Liquidating Agent |
| 4211 | Home National Bank of Milford | Receiver |
| 4245 | Milford Savings Bank | Liquidating Agent |
| 4253 | U.S. Savings Bank | Liquidating Agent |
| 4286 | First American Bank for Savings | Liquidating Agent |
| 4308 | Capital Bank & Trust Co. | Liquidating Agent |
| 4362 | University Bank, NA | Receiver |
| 4365 | Woburn Five Cents Savings Bank | Liquidating Agent |
| 4371 | First Mutual Bank For Savings | Liquidating Agent |
| 4393 | Lowell Institution For Savings | Liquidating Agent |
| 4398 | Bank Five For Savings | Liquidating Agent |
| 4417 | Coolidge Bank & Trust Co. | Liquidating Agent |
| 4430 | Granite Co-Operative Bank | Liquidating Agent |
| 4450 | The Central Savings Bank | Liquidating Agent |
| 4461 | The Bank For Savings | Liquidating Agent |

**ATTACHMENT 3**

<u>RELEASE</u>

**LOAN SALE NO. FCO-93-6BM16**
**PACKAGE 6BM16**

The undersigned was/were Debtor(s), of ___(Name) (City)___, ___(State)___, at the time it was closed and the Federal Deposit Insurance Corporation ("FDIC") appointed Receiver. Subsequent to its appointment as Receiver, the FDIC sold Notes evidencing said indebtedness [corporate asset], together with all Collateral and Security Instruments to _____ which has now agreed to renew, extend, renegotiate, compromise, settle, or release, as the appropriate case may be, the following identified Loan(s), and as consideration therefor, the undersigned agrees to execute this Release in favor of third-party beneficiaries _____ and FDIC ("Released Parties"):

| Note/Loan Number | Original Principal Amount | Note/Loan Date | Debtor(s) |
|---|---|---|---|
| _____ | $ _____ | _____ | _____ |
| _____ | $ _____ | _____ | _____ |
| _____ | $ _____ | _____ | _____ |

Debtor(s), his/their heirs and assigns/itself, its successors and assigns (as the appropriate case may be), hereby releases, acquits, and forever discharges _____ and the FEDERAL DEPOSIT INSURANCE CORPORATION in its [corporate] [receivership] capacity _____ _____, THEIR AGENTS, SERVANTS AND EMPLOYEES, AND ALL PERSONS AND ENTITIES IN PRIVITY WITH THEM OR ANY OF THEM, from any and all claims or causes of action of any kind whatsoever, at common law, statutory or otherwise, which Debtor(s) and those on whose behalf Debtor(s) signs has or might have, whether known or unknown, now existing or arising hereafter, directly, indirectly, or remotely attributable or related to the above-described note(s) or Loans(s), this Release being intended and understood to release all present and future claims of any kind which Debtor(s) and those on whose behalf Debtor(s) sign(s) might have against those hereby released, arising from or growing out of any act or omission occurring prior to the date of this Release.

_____
Date of this Release

_____
(Debtor or duly authorized representative of Debtor)

BY: _____

ITS: _____

**ATTACHMENT 4**

<u>AFFIDAVIT AND</u>
<u>ASSIGNMENT OF CLAIM</u>

**LOAN SALE NO. FCO-93-6BM16**
**PACKAGE 6BM16**

State of _____

County of _____

      The undersigned, being first duly sworn, deposes and states as follows:

      The Federal Deposit Insurance Corporation, in its [receivership] [corporate] capacity, ("Assignor") of _____(Address)_____ acting by and through its duly authorized officers and agents, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged does hereby sell, transfer, assign and set over to _____"Assignee" of _____[insert purchaser's address]_____, its successors and assigns, all of the Assignors's interest in any claim in the bankruptcy case commenced by or against _____[insert debtor's name]_____ ("Debtor") in the U. S. Bankruptcy Court ___[insert district of the court, such as for the Western District of Texas], being designated as Case Number _[insert docket number assigned case]_ ("Bankruptcy Claim"), or such part of said Claim as is based on the promissory note of _[insert the names of the makers of the note exactly as they appear on the note]_, dated [insert the date the note was made]_, and made payable to [insert the name of the payee on the note exactly as it appears on the note]_, provided, however, that this assignment is made pursuant to the terms and conditions as set forth in that certain Loan Sale Agreement between the Assignor and the Assignee dated [insert the date of the governing Loan Sale Agreement]_,19___.

      For purposes of Bankruptcy Rule 3001, this assignment and affidavit represent the unconditional transfer of the Bankruptcy Claim or such part of the Claim as is based on the promissory note or notes described in paragraph one above and shall constitute the statement of the transferor acknowledging the transfer and stating the consideration therefor as required by said Rule 3001.

      The consideration for the transfer was cash. The transfer of the debt was pursuant to the Loan Sale Agreement described in paragraph one above, through which numerous debts were sold; no specific amount of the total consideration was assigned to the debt which forms the basis of claim.

      This assignment shall also evidence the unconditional transfer of the Assignor's interest in any security held for the claim.

      IN WITNESS WHEREOF, the Assignor has caused this Affidavit and Assignment of Claim to be executed at _____, _____ this _____ day of _____, 19____.

                               FEDERAL DEPOSIT INSURANCE CORPORATION

                       _____[Capacity]_____

                       By: _____

                       Its: Attorney-in-Fact

**ACKNOWLEDGMENT**

STATE OF _____          )
                                              )
COUNTY OF _____         )

      Before me, the undersigned authority, a Notary Public in and for the county and state aforesaid, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument, as Attorney-in-Fact of the Federal Deposit Insurance Corporation, of _____, and acknowledged to me that he executed the same as the act of the FEDERAL DEPOSIT INSURANCE CORPORATION, for the purposes and consideration therein expressed, and in the capacity therein stated.

      Given under my hand and seal of office on this the _____ day of _____, 19____.

_____
Notary Public

_____
My Commission Expires

_____
Printed Name

**ATTACHMENT 5**

REPURCHASE PRICE FOR LOANS
IN A
MIXED QUALITY LOAN SALE

**LOAN SALE NO. FCO-93-6BM16**
**PACKAGE 6BM16**

This Loan Sale contains mixed quality Loans, the repurchase of which require application of the Method B Repurchase Price as set forth in Paragraph 1.19 of the Loan Sale Agreement.  The tiered repurchase formula set forth below applies solely to the calculation of Repurchase Prices.

As shown on the Schedule of Loans, Attachment 1, the Seller has categorized each Loan within the Loan Packages for sale in this transaction.  The Seller will calculate a Repurchase Percent for each category, and that Repurchase Percent will be used to determine the Repurchase Price for Loans within that category.

The Seller will calculate the Repurchase Percent by (i) dividing the Loan Purchase Price, by (ii) the asking price for the Loans purchased, and (iii) multiplying the result by the dollar portion of the asking price assigned to the category, and (iv) dividing that result by the Book Value of the category.

With respect to this transaction, the Book Value and assigned dollar portions of the aggregate asking price for each category of Loan are:

| Loan Package No. | Category | Book Value | Assigned Dollar Portion of Asking Price | Total Asking Price |
|---|---|---|---|---|

SEE ATTACHED SPREADSHEET

FEDERAL DEPOSIT INSURANCE CORPORATION
BULK SALE NUMBER: FCO–93–6BM16

# REPURCHASE SCHEDULE

| | | | BOOK | | | | |
|---|---|---|---|---|---|---|---|
| | | | VALUE | SALE | | | |
| 506 FRANKLIN CONSOLIDATED OFFICE | | | | | | | |
| 6.00% : CURRENT PRIME RATE | | | | | | | |
| | | | AS OF | PRICE | SALE | REPURCHASE | REPURCHASE |
| PKG # | LAMIS NUMBER | BORROWER | 12/23/93 | AS % | PRICE | FACTOR | PRICE |

## 6BM16

| PKG # | LAMIS NUMBER | BORROWER | BOOK VALUE AS OF 12/23/93 | SALE PRICE AS % | SALE PRICE | REPURCHASE FACTOR | REPURCHASE PRICE |
|---|---|---|---|---|---|---|---|
| 6BM16 | 4202000165033 | SPENLINHAUER ROBERT J | 429,880.69 | 60.00% | 257,928.41 | 0.6 | 257,928.41 |
| 6BM16 | 4202000165643 | WATKINS NORRIS | 114,070.40 | 60.00% | 68,442.24 | 0.6 | 68,442.24 |
| 6BM16 | 4202003964561 | BRETON JOHN | 58,837.02 | 60.00% | 35,302.21 | 0.6 | 35,302.21 |
| 6BM16 | 4211001696981 | ARBETTER STEPHEN | 142,710.96 | 60.00% | 85,626.58 | 0.6 | 85,626.58 |
| 6BM16 | 4211001713311 | KING, TERRY* | 111,776.15 | 60.00% | 67,065.69 | 0.6 | 67,065.69 |
| 6BM16 | 4211001713421 | KING, TERRY* | 108,623.91 | 60.00% | 65,174.35 | 0.6 | 65,174.35 |
| 6BM16 | 4211001724371 | ADAMS DAVID | 50,000.00 | 60.00% | 30,000.00 | 0.6 | 30,000.00 |
| 6BM16 | 4245001692031 | HUMPHREY'S LIMITED* | 60,152.00 | 60.00% | 36,091.20 | 0.6 | 36,091.20 |
| 6BM16 | 4245001692061 | HUMPHREY'S LIMITED* | 6,094.79 | 60.00% | 3,656.87 | 0.6 | 3,656.87 |
| 6BM16 | 4245004033211 | OMALLEY MARY* | 33,407.15 | 60.00% | 20,044.29 | 0.6 | 20,044.29 |
| 6BM16 | 4286002177131 | MCCANN JOHN C | 65,540.83 | 60.00% | 39,324.50 | 0.6 | 39,324.50 |
| 6BM16 | 4308002261361 | PALUMBO ANTHONY | 110,547.73 | 60.00% | 66,328.64 | 0.6 | 66,328.64 |
| 6BM16 | 4308002264801 | GRUBBS, SANDRA K | 152,696.53 | 60.00% | 91,617.92 | 0.6 | 91,617.92 |
| 6BM16 | 4308002267611 | VIGLIOTTI DAVID JR | 147,519.34 | 60.00% | 88,511.60 | 0.6 | 88,511.60 |
| 6BM16 | 4312000188603 | KELLY, GREGORY | 118,117.28 | 60.00% | 70,870.37 | 0.6 | 70,870.37 |
| 6BM16 | 4362003924781 | DRISCOLL, MICHAEL | 154,572.17 | 60.00% | 92,743.30 | 0.6 | 92,743.30 |
| 6BM16 | 4362500001713 | HIPP, CHARLES M | 183,698.05 | 60.00% | 110,218.83 | 0.6 | 110,218.83 |
| 6BM16 | 4362500012421 | MULLINGS, LUKE L | 207,627.13 | 60.00% | 124,576.28 | 0.6 | 124,576.28 |
| 6BM16 | 4371004029991 | MORAN*** PHILIP D | 290,712.38 | 60.00% | 174,427.43 | 0.6 | 174,427.43 |
| 6BM16 | 4393004008321 | O'DONNELL, JOHN D | 180,470.48 | 60.00% | 108,282.29 | 0.6 | 108,282.29 |
| 6BM16 | 4393500237251 | SULLIVAN BRIAN | 47,697.08 | 60.00% | 28,618.25 | 0.6 | 28,618.25 |
| 6BM16 | 4417000181683 | PASQUARIELLO DAVIS J* | 33,066.24 | 60.00% | 19,839.74 | 0.6 | 19,839.74 |
| 6BM16 | 4417000181693 | PASQUARIELLO DAVIS J* | 44,388.63 | 60.00% | 26,633.18 | 0.6 | 26,633.18 |
| 6BM16 | 4417000181703 | PASQUARIELLO DAVIS J* | 44,653.24 | 60.00% | 26,791.94 | 0.6 | 26,791.94 |
| 6BM16 | 4417000181713 | PASQUARIELLO DAVIS J* | 44,653.24 | 60.00% | 26,791.94 | 0.6 | 26,791.94 |
| 6BM16 | 4430000181213 | MELONE LORETTO F | 101,169.93 | 60.00% | 60,701.96 | 0.6 | 60,701.96 |
| 6BM16 | 4430000201303 | CIAMPA JR, JOSEPH J | 88,470.48 | 60.00% | 53,082.29 | 0.6 | 53,082.29 |
| 6BM16 | 4430004023411 | THOMAS, CAROL J | 83,334.75 | 60.00% | 50,000.85 | 0.6 | 50,000.85 |
| 6BM16 | 4450500025083 | KEOMOUANGCHANH PHO | 138,287.03 | 60.00% | 82,972.22 | 0.6 | 82,972.22 |
| 6BM16 | 4450500040893 | ALEX, SAMUEL | 93,464.24 | 60.00% | 56,078.54 | 0.6 | 56,078.54 |
| 6BM16 | 4450500041133 | ERAMO***, PETER | 50,284.86 | 60.00% | 30,170.92 | 0.6 | 30,170.92 |
| 6BM16 | 4461000211983 | BROWN, JOSIE L | 116,025.90 | 60.00% | 69,615.54 | 0.6 | 69,615.54 |
| 6BM16 | 4461500034563 | GAMES, PAUL M | 120,357.97 | 60.00% | 72,214.78 | 0.6 | 72,214.78 |
| 6BM16 | 4461500034963 | JOSHI, PRABHAKAR G | 35,994.35 | 60.00% | 21,596.61 | 0.6 | 21,596.61 |
| **TOTALS** | | **34** | **3,768,902.93** | | **2,261,341.76** | | **2,261,341.76** |

## CERTIFICATE OF CORPORATE RESOLUTIONS

I, the undersigned, hereby certify that I am Secretary of South Star Management Company, Inc., a corporation duly organized and existing under the laws of the State of Florida.

I further certify that pursuant to a written consent signed by the members of the Board of Directors, the following Resolutions were duly adopted, and such Resolutions are now in full force and effect and have not been amended, modified or revoked:

"RESOLVED, that any officer of this corporation, including without limitation the President, Vice President, Treasurer or Secretary of this corporation (each, an "Officer") is hereby authorized, for and on behalf of this corporation, to purchase loans from the Federal Deposit Insurance Corporation (the "FDIC"), which loans are identified as FDIC Loan Sale No. FCO-93-6BM16, FDIC Loan Sale No. FCO-93-6AM02-03, and FDIC Loan Sale No. FCO-93-6JB20-21 (collectively the "Loans").

FURTHER RESOLVED, that any Officer is hereby authorized for and on behalf of this corporation to execute and deliver purchase agreements for each of the Loans in form substantially similar to those previously exhibited to the Board of Directors (each a "Purchase Agreement") and such other documents as may be desired or required by the FDIC in connection with the sale of the Loans and containing such terms and conditions as may be acceptable or agreeable to any Officer, such acceptance and agreement to be conclusively evidenced by such Officer's execution and delivery thereof;

FURTHER RESOLVED, that any Officer is authorized and empowered to do or cause to be done all such acts or things and to sign and deliver, or cause to be signed and delivered, all such documents, instruments and certificates (including, without limitation, and all notices and certificates required or permitted to be given or made to the FDIC under the terms of any Purchase Agreement in the name and on behalf of this corporation or otherwise, as any Officer, in his or her discretion, may deem necessary, advisable or appropriate to effectuate or carry out the purposes and intent of the foregoing Resolutions and to perform the obligations of this corporation under all instruments executed on behalf of this corporation in connection with the Loans;

FURTHER RESOLVED, that the execution of any document authorized by the foregoing Resolutions or any document executed and delivered in the accomplishment of any action or actions so authorized by any Officer, shall be the enforceable and binding act and obligation of this corporation with or without the attestation of any other Officer or the affixing of the corporate seal of this corporation;

FURTHER RESOLVED, that all acts, transactions, or agreements undertaken prior to the adoption of these Resolutions by any Officer or representative of this corporation in its name and for its account with the FDIC in connection with the foregoing matters are hereby ratified, confirmed and adopted by this corporation; and

FURTHER RESOLVED, that the Secretary of this corporation is hereby authorized and directed to certify these Resolutions to the FDIC."

I further certify that these Resolutions are within the power of the Board of Directors as provided in the Articles of Incorporation and Bylaws of this corporation.

IN WITNESS WHEREOF, I hereunto subscribe my name and affix the seal of this corporation on the 14th day of December, 1993.

_____
Bernard A. Shafran
Secretary

2

EXHIBIT B

## AFFIDAVIT *(Third Party)*

### Mortgage/Deed of Trust

STATE OF Massachusetts ) 
) ss: July 9, 2002

COUNTY OF Worcester )

E. Perry King and Terry A. King

Mortgagor(s)/Trustor(s)

January 27, 1988 $ $112,000

Date of Mortgage/Trust Deed                    Amount of Mortgage/Trust Deed

The undersigned, Alan Mason, Attorney _____, being duly sworn, deposes and says:

1. I am over the age of eighteen years and the owner of a certain real property known as:

   (street address) 19 Canton Street , city of Worcester
   State of Massachusetts . I am familiar with and have personal knowledge of the facts stated herein.

2. The premises is encumbered by a Mortgage/Trust deed in favor of the Federal Deposit Insurance Corporation as Receiver of (name of failed bank) Home National Bank of Milford The Mortgage/Trust Deed was given to secure a note in the original principal amount of $ 112,000 ; (the "Note"). The Mortgage/Trust Deed was recorded in the county of Worcester . State of Massachusetts , in book 11097 , at page 122 on (date recorded) January 28, 1988 Assignment of Leases and Rents Book 11097 Page 129

3. I certify that the Note and Mortgage /Trust Deed was paid in full on (date) August 1991 by refinancing _____, or normal payoff X , or other (explain) _____

4. In the event that it is determined that there are monies due and owing ... er the Note, said monies will immediately be remitted to the Federal Deposit Insurance Corporation as Receiver of (name of failed bank) Home National Bank of Milford

5. I make this Affidavit in order to induce the Federal Deposit Insurance Corporation as Receiver of (name of failed bank) Home National Bank of Milford to discharge Mortgage/Trust Deed. I agree to indemnify the FDIC against any and all loss as a result of a claim for wrongful discharge of the Mortgage/Trust Deed. I am aware that the FDIC will rely on the Truthfulness and the statements contained herein. I am aware that any person who makes false representations to the Federal Deposit Insurance Corporation is subject to criminal prosecution pursuant to 18 U.S.C. § 1007.

Signature Attorney Alan Mason                    Signature

Sworn and subscribed to before me this 9th day of July 2002

Notary Public Sheila A. Rodgers
My commission expires: 11/6/2003

Whoever, for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation knowingly makes or invites reliance on a false, forged, or counterfeit statement, document, or thing shall be fined not more than ...

EXHIBIT C

## AFFIDAVIT (Third Party)
### Mortgage/Deed of Trust

STATE OF  Massachusetts                    )
                                           ) ss.:
COUNTY OF  Worcester                       )

E. Perry King and Terry A. King
Mortgagor(s)/Trustor(s)
January 27, 1988
Date of Mortgage/Trust Deed

$ 112,000
Amount of Mortgage/Trust Deed

The undersigned, E. Perry King and Terry A. King
, being duly sworn, deposes and says:

1.   I am over the age of eighteen years and the owner of/for certain real property known as:
19 Canton Street
(street address)
State of Massachusetts , city of Worcester . I am familiar with and have personal knowledge of
the facts stated herein.

2.   The premises is encumbered by a Mortgage/Trust deed in favor of the Federal Deposit
Insurance Corporation as Receiver of (name of failed bank) Home National Bank of Milford
The Mortgage/Trust Deed was given to secure a note in the original principal amount of
$112,000 (the "Note"). The Mortgage/Trust Deed was recorded in the county of
Worcester State of Massachusetts , in book 11097 , at page 122 on
(date recorded) January 28, 1988 Assignment of Leases Book 11097 Page 129
                                and Rents

3.   I certify that the Note and Mortgage /Trust Deed was paid in full on (date) August 1991
by refinancing _____ , or normal payoff X _____ , or other (explain) _____

4.   In the event that it is determined that there are monies due and owing ____ the Note, said
monies will immediately be remitted to the Federal Deposit Insurance Corporation as
Receiver of (name of failed bank) Home National Bank of Milford

5.   I make this Affidavit in order to induce the Federal Deposit Insurance Corporation as
Receiver of (name of failed bank) Home National Bank of Milford to
discharge Mortgage/Trust Deed. I agree to indemnify the FDIC against any and all loss as
a result of a claim for wrongful discharge of the Mortgage/Trust Deed. I am aware that
the FDIC will rely on the Truthfulness and the statements contained herein. I am aware
that any person who makes false representations to the Federal Deposit Insurance
Corporation is subject to criminal prosecution pursuant to 18 U.S.C. § 1007

Signature  E. PERRY KING

Signature  T.A. KING

Sworn and subscribed to before me this 18th day of July 2002

Notary Public  Alan Mason
My commission expires: March 21, 2008

Whoever, for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation _____
maker or invites reliance on a false, forged, or counterfeit statement, document, or thing shall ____

EXHIBIT D



Bk: 35934 Pg: 39    Doc: DEED
Page: 1 of 2    03/22/2005 11:44 AM

Metropolitan Title Co.
96 W. Main St.
Northborough, MA

QUITCLAIM DEED

I, Sandra Katz  of Worcester, Worcester County, Massachusetts in consideration of THREE HUNDRED THOUSAND AND 00/100 ($300,000.00) DOLLARS

grant to          Fatu Miller

of               19 Canton Street
                 Worcester, Massachusetts

with **QUITCLAIM covenants**

**PROPERTY ADDRESS:**    19 Canton Street, Worcester, MA

The land in Worcester, Worcester County, Massachusetts, mi the southerly part thereof, in the section known as Irvington, on the southerly side of Canton Street, shown as Lot 17 on a plan of lots drawn for the Ballard Land Company by Buttrick & Pratt, recorded in Book 1537, Page 653, and bounded and described as follows:

BEGINNING at a stone monument set at the northwesterly corner of the herein described premises on the southerly side of Canton Street, formerly known as Albion Avenue;

THENCE Southerly by Lot 18, a distance of 100 feet to a stone monument;

THENCE Easterly by Lot 35 and 36, a distance of 50 feet to a stone monument;

THENCE Northerly by Lot 18, a distance of 100 feet to a stone monument on the southerly side of said Canton Street, formerly of Albion Avenue;

THENCE Westerly by said Canton Street, 50 feet to the point of beginning.

MASSACHUSETTS EXCISE TAX
Worcester District ROD #20 001
Date: 03/22/2005 11:44 AM
Ctrl# 033457 32307 Doc# 00043493
Fee: $1,368.00 Cons: $300,000.00

Return To:

The Law Office Of Joseph P Lussier
484 Main St.
Suite 420
Worcester, MA. 01608
(508)799-7400



Page 1 of 2

BEING the same premises conveyed to the grantors by deed dated December 19, 2003 and recorded with the Worcester District Registry of Deeds in Book 32728, Page 33.

Executed as a sealed instrument this   **18th**  day of **March**          , 2005.

_Sandra Katz_
Sandra Katz

COMMONWEALTH OF MASSACHUSETTS    WORCESTER SS

On this   **18th**   day of **March**          , 2005, before me, the undersigned notary public, personally appeared <u>Sandra Katz</u>, proved to me through satisfactory evidence of identification which were <u>Driver's Licenses</u> to be the person whose name is signed on the preceeding or attached document, and acknowledged to me that he/she/they signed it voluntarily for its stated purpose.

Official signature and seal of notary **Cheryl J. Morrill**
My commission expires: **February 23, 2012**

OFFICIAL SEAL
CHERYL J. MORRILL
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
My Comm. Expires Feb. 23, 2012

Page 2 of 2

ATTEST: WORC. Anthony J. Vigliotti, Register